We have the hearing on In Re The Majestic Star Casino LLC, numbers 12-3200 and 12-3201. Mr. Dale, Mr. Gordon, and Ms. Casasa. Good afternoon and may it please the court, my name is Ivan Dale on behalf of the United States of America. I have the court measure two minutes for the time limit. We usually don't keep strictly to the clock anyway, so it will be fine. If people fall asleep over the prior hearing we had, you're going to know when you're going to be finished. Well in this case, hopefully people won't fall asleep. We were asked to decide whether an election to tax a non-debtor corporation as a C corporation rather than an S corporation was a transfer of property of a bankrupt subsidiary of that corporation. Simply because of the statutory consequence of terminating the parent's S corporation status was that it could be debtor subsidiary and no longer qualified or would be classified. Let me ask you, one of the things that we stumbled on and it would seem to have helped your case was 1398G of 1026 which says the estate shall succeed to and take into account the following items of the debtor in the taxable year in which the case commences. And one of them was net operating loss carryovers and a number of other things, but not the replication of Q sub status or sub S status. That's correct. That's not something that was cited in the briefs, but I do know that that provision, 1398, first of all I think that's applicable to individuals. I think 1398 is applicable to individuals and not corporations. I'm not quite sure about that. Doesn't it give some insight, even if that limitation is accurate, doesn't that give some insight into whether or not entity status is the sort of thing that could be viewed as transferable property? You can certainly argue by analogy that the omission of a tax status or classification from those items which the debtor succeeds to in the case of an individual reflects Congress's view that a tax status or classification is not the sort of property that would pass to the debtor. Does the replication of S corp status mean that a Q sub is deemed to be a new corporate entity? Isn't that how the regulations treat by operation of law what happens? That's correct. The regulations treat it as a corporation commencing on a date of unification. Okay. And if that's true, does that have, does that legal fact have any implications for the standing of the new entity making the complaint it's making here? No, it's a new corporation for tax purposes. I don't know that it's necessarily a separate legal entity for other purposes. That's exactly what I'm asking. Right. So I don't think that it does. I think that that's not a standing problem alone. But as long as we're talking about standing, is there a question of whether the end tax status of the S corp is something that the Q sub can rightfully assert rights in or rights about? In other words, is this third party standing their argument for? What's their basis for being in here? Is that something that you're in a position to talk about? Well, they're saying, their argument, as I understand it, is that the election by the S corporation had the downstream effect of requiring them to pay income taxes on income earned. Right. Even under their view, and of course we'll be talking more about this, but even under their view, the cases talk about S corp status being something that belongs to the S corporation. Where is there a law that says that a Q sub is in a position to say, hey, wait a second, your S corp status is something I have a right to argue about and argue for and claim benefit from? Well, the answer to that is there is no case that says that the Q sub could challenge the S corp's decision to revoke its status. I think that's the dispositive factor in this case is that prior to the bankruptcy filing, if the officers and directors of Majestic 2 were adamantly opposed to Barton Development, Inc., terminating its S corporation status, they would be powerless to prevent it. And therefore they had no right, and that's how we frame it, is that they have no right to compel otherwise, and therefore they have no protectable property right. Is it correct or incorrect to think of that in terms of standing? Is that just a mistaken way of thinking about it? Well, I haven't thought about it in sort of the constitutional sense of standing. Not constitutional. Credential standing. Well, I think so. I think that the way that the statute is written is essentially to give the S corporation, and actually more specifically the shareholders of the S corporation, the right to structure their subsidiaries for tax purposes, because ultimately it's the shareholders on the court. Why does the United States, why does the government really have an interest at stake here? What's the practical consequences of disallowing the revocation of the subchapter S? What we're concerned about is the circumstance where a corporation is in bankruptcy and generating lots of income through the sale, capital gains through the sale of its assets, and income through operations. All that income, if the shareholder doesn't have the right to revoke his S corporation status, to revoke the past year consequence of that income, then what you're going to have is the corporation essentially passing a massive tax liability on to the shareholder without the shareholder having the ability to extract the funds to pay it. So I think the government is sort of defending the congressional rationale in giving that choice to the shareholder, but we certainly have a concern that we will be left on the hook for large tax liabilities owed by shareholders who lack the funds to pay for it. That's a good point you make, but you could actually flip that around and argue that it's unfair to permit the bargain appellates normally to authorize Majestic II to file for bankruptcy, and then almost immediately thereafter revoke the tax status so that the former Q-sub is now liable for $2.43 million worth of taxes. I'm not sure that that's unfair. The unfairness of that that I see is that maybe the bargain didn't give notice to the corporation that he was going to do that, so I think there were some estimated tax penalties involved. Because the taxes, they hit the Q-sub because it had income, right? Right. So the point that I think somebody arguing against your, the point that you're positing, the argument against it would be, look, Chapter 11 is for the purpose of reorganization, and if we were in your favor, it opens the door for S-corps, both debtors and non-debtors, to revoke their elections and shift the tax burdens onto the estate and thereby reduce the creditors' recoveries, which seems to be contrary to the way we normally think of the purpose of Chapter 11. Well, I mean, I would say to that, you know, if this were a circumstance where you perceived that the shareholder were acting in order to collect on a prepetition debt, then there are remedies that the debtor has to prevent the collection of a prepetition debt. In terms of the preservation of assets for the benefit of creditors, I mean, the fact of the matter is you have to find first that this is something which the debtor had a right to that requires preservation. I don't see anything particularly inequitable in prior to bankruptcy, the shareholder getting the benefit of losses, because those losses sort of reflect the diminution of value of his shareholder interest, and then turning around after bankruptcy, revoking the S-corporation election, and thus burdening the company that earns the income with the obligation to pay tax, because at that point there's no accession to wealth on the part of the shareholder, so the tax tracks the accession to wealth that the debtor corporation sustains. So I actually view that what occurred in this case not only is not inequitable, but I feel like that's the way that it ought to operate. I take it in a reorganization it's not unusual to have sale of assets, and under the scenario that exists now, if the revocation was set aside, any capital gains liability, tax liability would flow through the bargain, even though all of the income went to the CUSO. That's correct. Essentially you could have a circumstance where the debtor corporation is essentially operating tax-free, and the government essentially unable to collect from the shareholder. It has to subsidize it. Yeah, the whole original purpose of sub-assets is to avoid double taxation. Right. So I see I'm running out of time. That's fine. We'll get you back in a rebuttal. Okay. Thank you. Mr. Gordon. Good afternoon and peace of court. I'm Joe Gordon. Actually, you probably, if you want to take a crack at the point or the question that I posed to Mr. Dale, which is, doesn't it seem unfair to permit your clients to knowingly enter Majestic II into bankruptcy, and then almost immediately thereafter revoke its tax status? No. Let me explain why. Okay. First of all, the two cases that we talked about for the S election, previous cases and history cases, including Transilvania and Bakersfield-Western, dealt where the actual debtor was the S corporation, and the parent was electing or revoking the election. In this case, it's a DUI. None of the debtors had the right, or the S corporation had the right to elect. The damage here is actually to the bottom entities, specifically DUI.Martin. Because, as was alluded to by the court, the implication of this was that a QSUB lost its QSUB designation, creating a liability that was between January 1, 2010, and November 27, 2011, when the plan, when they converted MSC II to an LLC in anticipation of substantial conservation of the plan on the effective date of December 1, 2011. A fine amount of damage. What has happened here is that, by virtue of that election, it captured that the DUI is approximately $100,000,000 plus, $170,000,000 of income that is generated primarily from cancellation of debt income, which is the purpose of bankruptcy in Chapter 11, is to rid a debtor, appropriately pursuant to a code, lower its structure, lower its capital structure, in this case reduce debt, cover some debt and equity, do various things, which created a substantial tax liability. That doesn't stay with these debtors. It doesn't stay with these debtors. Not to give esoteric, Chapter 11 essentially has two purposes. One is to allow someone that has too much debt to restructure that debt. Correct. Two, to have money flow to creditors that they're otherwise due. And there's an argument here, as I mentioned, that in effect you're taking $2.4 million just in the first year away possibly from creditors. Well, you've taken away a certain amount of money away from creditors, from the standpoint that that was virtue of the loss of the NSC, and created a damage, specifically in the amount of taxes for the period that was talked about, approximately 22 months or so. Okay, 23 months. Taxes. But let's go back to what the court did. The complaint that was... One second, sir. So are you conceding that the election damaged the Q-Sub? No, I'm not conceding that. First of all, you have to find that the Q-Sub had a property right, number one, that it was a property right. And number two, that it's a property of the state. What I'm saying is, as a result of the Q-Sub being eliminated, NSC2 now kept its income, had its income, and had a big taxes. I mean, Eurohub was one of the... They mentioned that just a few minutes ago. But the concept is that, wait a minute, they created income, but they had a big tax on it. What happened prior to this, as pointed out in the various briefs, was that the enemies flowed up to Mr. Barton. You'd be glad, Mr. Barton. The amount of taxes that he would pay that. With the petition, that stopped. That tax sharing, which was never an agreement, that informal tax sharing was in violation of the Interim Autonomy Documents. So that stopped. So all of a sudden, by virtue of what happened, is if the NSC had not been... What happened is the income, theoretically, would have flowed up to Mr. Barton. Not the cash, but the recognition income. And NSC would have avoided the tax. And that's something that, as the IRS has pointed out, raises questions of inequity, perhaps. But the question that I believe Judge Ambrose is posing, and I'd be interested to know, too, is, is there, even if you wouldn't concede it in this case, and I understand why you wouldn't, is there not a danger of gaining the system that's present if you allow a parent corporation to pull the Q-sub status of a subsidiary in connection with bankruptcy proceedings? I think that there's always a possibility of gaining the system. Whatever. Bankruptcy attorneys are trained to look for gaps and do various things for the benefit of the debtor, or for the benefit of the creditor. However, let's go back to the complaint. The complaint sought relief under two counts. One, a post-petition transfer in 509 with damages under 550. And 362, a violation with damages under 362K. Judge Rose, in his decision, at least five places, pages 2, 10, 12, and other places, said the issue before this court is whether or not there has been a post-petition transfer of property for which there is a remedy. He said this, and he then went on to say, I find that it's property, property right, which we disagree with. It's property of the estate, which we disagree with. And therefore, there are certain remedies. What he did was, when he read the order, and I have a problem with the order, because while he starts in his memorandum and talks about this, he just says, okay, the best elections were voted. I find they violated 549. I find they violated 362, 549, especially a post-petition transfer of property of the estate, but I'm not going to go there. What I'm going to do is revoke. Order revoked, which creates this huge damage of the big line. It doesn't really get, I guess it gets MSC working in the big, but it ignores the proposition of 550A. That's another problem with this decision. We agree with the government that it's not a property right. There's no control of MSC. And we signed to the Foreman case, which distinguished Prudential. I understand Prudential. I've argued Prudential. I saw injunctions based on Prudential and the concept that it belongs to the estate. The Foreman case said, in Prudential, that was the NRL belonged to the debtor. In Foreman, it was an escorbration of the elderly. They have no rights to that. Got you. Thank you. We'll get you back on the rebuttal. Tom, you have a question? Okay. Ms. Casaza. May it please the Court, Lauren Casaza from Crystal Manalis on behalf of the debtor appellees, including the entity at issue in this case, MSC2. It seems, just so we understand the framework, that we're at least tentatively thinking of our analysis, at least I am. One, is this property of the estate under 541? If it is property of the estate under 541, is there a transfer? If it is not property of the estate under 541, then is there standing? So, that's sort of the way I'm looking at it, unless you think there's another way that I should adjust my thinking. I think that's absolutely correct, Judge Ambrose, and as your Honor noted, those issues are dependent upon an analysis of how this Court has decided how to determine property of the estate. And as your Honor noted, there are two key principles underlying Chapter 11, this Court noted in the Philadelphia newspapers. Facilitate the reorganization of debtors as a viable entity, and protect creditors' interest by maximizing the value of the bankruptcy estate. As your Honor noted, the first, the key issue in this case, is was key sub-status and the valuable benefits it gave to MSC2, was that property of the estate under 541? And we believe it is. And that is because... That's a good point, but it looks like what you're analyzing is value. And clearly there is a value. But what about the other items that one normally looks to see whether you have property that you own or that is yours? It doesn't look like those were analyzed by the Court at all. Well, your Honor, I actually would respectfully disagree.  Or the ability to enjoy the use, or I guess control the use. I would argue, your Honor, that the issue of control was very much litigated down below and argued and that Judge Gross did consider this issue. But on control, where does Majestic have control of whether it is able to have key sub-status? So what I would say is this issue of control is actually, this question of control is actually misplaced. When you look at this Court's precedent in Ray Atlantic Business, in Ray Nitschberger, the question is the Court looks at, takes a snapshot on the day a petition is filed and looks at what are the interests of the debtor. What does it enjoy? What value does it have? And because, as this Court has noted in Nitschberger, the property stays pervasive, it takes a broad look at that. And if we look at whether MSC 2 enjoyed the status of key sub, no one disputes that. That they broadly had this status on the day that it was filed. Hold on. So your position is that anything of value, no matter what it is, qualifies as property of the estate? My position would be that that is not true. The appellants cited some cases saying, well, if it's stolen property, it still has value, but it's stolen and it's not part of the estate. Let me just say that. I mean, the IRS pointed out a liquor license is about as a matter of enormous value to a restaurant, but that doesn't mean it's property of the estate. You can pull it in a heartbeat. A landing spot at an airport is a matter of enormous value to an airline, but the FAA can revoke it in a heartbeat. These are things that an entity may use, may enjoy the benefit of, but it's not property in the meaningful sense of the word. And it's certainly not owned by the entity that has the advantage of it. What's wrong with that analysis? And how does that affect your ability to say that the CUSO status belongs to the CUSO? Well, what I would say, Mr. Shorten, is that the cases they cite for those premises, Braniff on the FAA slots, was a criticized opinion, but nonetheless focused its rationale on the fact that the interest involved there was derived from a rule, as that is defined under the APA, and that's not the situation we have here. But what I would say is that if you find that the issue of control outside bankruptcy, does someone have the right, does an entity have the right to maintain it, if you find that that's the test, which is what they're arguing, they're saying, well, outside bankruptcy, a CUSO has no right to maintain it,  Well, isn't it true that the estate succeeds to no greater ways than the debtor had just prior to the filing of the bankruptcy? That is absolutely true, Judge Anwar. What we would say is, at the time of the commencement of bankruptcy, MSP2 did enjoy that CUSO status until it was terminated. But as soon as you file for bankruptcy, it's frozen. It's frozen, and it's not the debtor who's getting rights to maintain it, it's simply by operation of the code that it's maintained. So does that mean that the bankruptcy code trumps all other regulations and laws of the United States of America? I mean, the Internal Revenue Code has a pretty good standing, don't you think? And the Internal Revenue Code says if the shareholder decides to terminate S-corp status, it's not an S-corp. If the S-corp parent decides to terminate CUSO status, it's not a CUSO. That's happening by operation of the law, is it not? Not because somebody is doing something nefarious, but because the code says it happens, right? That is correct. That is correct, and it is not the first time that the IRS or another agency has been foreclosed, or any other non-debtor, has been foreclosed for various actions that might impugn the core principles of Chapter 11. And in this case, the ultimate shareholder, Mr. Barton, he filed for bankruptcy for this entity, but now he's claiming it's not really an entity, it's a non-entity for tax purposes. And he bears the burdens from having benefits of what he had outside of bankruptcy. But there's various examples of where Congress, you know, considered the rights of the IRS and the Internal Revenue Code and determined that they're foreclosed from certain actions during this pendency, this automatic stay that's imposed by Chapter 11. Let's talk about rights and remedies. The argument is made, and it seems pretty persuasive, that what the Bankruptcy Court ordered here creates a gigantic windfall and an unending burden on Mr. Barton's estate and on BDI. By saying the Q-sub status is restored and it's going to be a pass-through entity, creditors now have the benefit of a tax-free entity, and they keep the income, and BDI and Mr. Barton's estate get the tax liability forever after. Is that a correct assessment of the effect of the Bankruptcy Court's ruling? What the Bankruptcy Court did was... Answer my question first, Ms. Jackson. Is that a correct assessment of the effect of the Bankruptcy Court's ruling? I would respectfully say no, because what the Bankruptcy did was what the Bankruptcy Code recognizes as the principle of the automatic stay. It brought things back to the status quo that existed on the commencement of the case. Does that mean that it has tax-free status? That means that it retains its Q-sub status and does not pay taxes. So it has tax-free status, and who pays the taxes on the income it generates? That would be borne by the parent escort. So in what respect was my question to you incorrect? You said no. It has tax-free status, and Mr. Barton's estate and BDI will pay the taxes forever after. According to the court's order, isn't that an option? Well, I guess what I would say is the part that I disagreed with forever after, because there is an end to a Chapter 11 bankruptcy, is what I would say. Is there anything in the court's order that says this Q-sub status will terminate upon the end of the Chapter 11 bankruptcy? No, there isn't, but what I'm saying is that the notion that the escort is forever having to pay this entity's taxes is not really the case, because at some point, the debtor is going to emerge from bankruptcy and have a different form. Let's go back to the question that Judge Jordan asked a little bit ago. What defines what is property? Now, normally, since I used to practice bankruptcy, obviously, Butler taught us that you look to state law, but if state law doesn't give the answer, don't hear you look to the Internal Revenue Code. The Internal Revenue Code determines the nature and existence of a right, and the code doesn't talk at all about the ability to come in post-petition and bankruptcy and say, because you have a value here, you can preserve that value and call it property. What does the code tell us as to what is or is not property? The Internal Revenue Code provides that a Q-sub does not pay income taxes. That is a valuable interest. And in Hedge-Burger, this is like... If you're a Q-sub. If you're a Q-sub. And you don't have any rights greater than what you had. In other words, the day before the bankruptcy, Mr. Barden or BDI could have terminated the sub-S for BDI and then ultimately the Q-sub status for Majestic. Isn't that correct? The day before bankruptcy. Well, you would regard that as a fraction of convenience, wouldn't you? Yes, I was going to say that it would be a different topic. I knew that would be a problem. I agree with Your Honor that outside of bankruptcy, the S-corp would have that right. This is where there's some confusion, I think, with the accountants. We are not saying that MSC2 should have had the right to control its Q-sub status prior to bankruptcy. And frankly, we're not saying that MSC2 has the right to control it during bankruptcy. We're saying that by operation of the code, that status is maintained. You mean the bankruptcy code? Correct, the bankruptcy code. But isn't the right given by the Internal Revenue Code? Yes, it is. And in Hedge-Burger, this court said that the label that non-bankruptcy law fixes to something is not the dispositive issue. The principal question is whether the substance of the right or interest in the question or is it within the scope of a bankruptcy state. And that is exactly what Judge Gross did here. He looked at the Internal Revenue Code and saw that Q-subs do not pay taxes on their income. And he saw that, which no one disputes, MSC2 lawfully had that status on the day it filed. And he preserved that status under 362 of 549 and brought it back to the status quo, which is how the bankruptcy code is intended to operate. How about I ask Mr. Dale about 1398 and he points out correctly that it applies to individuals. But why, by analogy, shouldn't we look to that when it says that under 1398G that NRLs are covered, but it doesn't mention anything about tax-exempt status? Well, I would submit that the silence on that does not necessarily negate the breadth and the pervasive nature of the analysis that a court needs to do to determine whether something is property or estate. And we cited a whole bunch of net operating loss cases, Prudential, Henry Russell, which we think are instructive on this point of the pervasive nature of property. And I respectfully submit those cases. We're not relying on that provision of the code with NRLs being listed, but really looking at whether this is something that brings value to the estate and would go to sort of the core principles of what the statute says. Let's turn things around a little bit. Let's say you're told the plan of the organization, the planning stage, and you've got the ability to go out and get a number of investors, more than 100. Do you have the right to terminate sub-est status if you no longer think it's in your benefit to have it? Because if you have more than 100 shareholders, you can't have sub-est status. Well, I would say that you do not have the right to do it unless you seek authorization from the court. Understood. It's part of the plan. You seek authorization from the court to have over 100 investors here and to terminate sub-est status even though BDI, Mr. Barden, who no longer want it, don't want that to happen. Does the court have the authority to do that? I guess I would say yes, the court does have the ability. So heads you win, tails they lose. Well, I don't think it can really be seen that way, particularly given the facts of this case. Why not? Because the tax code says that's exclusively the right of the shareholder. It doesn't belong to the corporate entity. It belongs to the shareholder. So how is it not the case that the position you're arguing for means that the shareholder loses either way? Well, I guess I misunderstood the question. What I'm saying is that in either case, the bankruptcy court has the obligation to maintain status quo. And whether it's terminated that way or terminated by litigation, that is taking possession of properties. Does that not rewrite the Internal Revenue Code? I mean, you're arguing that under the bankruptcy law, the carefully crafted and calibrated Internal Revenue System gives way in a way that just writes a statute out or rewrites a statute. It's no longer the right of the shareholder. It is the right of the corporate entity, even though that's contrary to the express language of the statute. Is that the power that the bankruptcy code gives to a bankruptcy judge? Respectfully, Judge Jordan, I guess it is, but I disagree with your point that it totally negates the Internal Revenue Code. All it's doing, and this is not new, is suspending an action of a non-debtor during the pendency of a bankruptcy. That is what it's doing because that action will serve to minimize the goal of maximizing the value of the estate for creditors. Congress took all of this into its calculation in balancing the interests and found that Chapter 11 has benefits and burdens to debtors and non-debtors and all the various stakeholders that care about having a rehabilitated entity. And all other statutes would bow before it. Absolutely not. I mean, this Court has looked at the police powers and whether various regulatory agencies have the power to trump an automatic stay in various instances. Every case is different, but we would say that here it's really not that complicated. And that the IRS has foreclosed. The IRS didn't take the action here, first of all, but they foreclosed from various things during bankruptcy. Let's look at transfer for a moment and assume it's property, and assume it's even property of the estate. Doesn't the theory here require that it be property of the estate that's transferable? Right? I mean, isn't that part of the underpinning of the argument? Correct. Okay. Who's the transferee here? Doesn't the notion of transfer imply a transferee or a transferee? It necessarily does. And who's the transferee? In this case, I suppose it could be the IRS. It could be the parent corporation. But respectfully, the transfer here was the action taken to dispose of the property, which is how it's defined under the Code. Respectfully back at you. I don't know how there can be a transfer without a transfer. It really can't be the IRS. Come on. Well, I guess what we would say is that that interest is transferring back to the parent and the ultimate shareholder here. Okay. Part of what you're doing here is if you go with what the bankruptcy court ordered here, which is the wind statement of Q-sub status, that means that its income to the debtor is tax-exempt, but BDI or bargaining, which is a state, now gets all the liabilities, right? In bankruptcy, once that Q-sub is filed in bankruptcy. So I talked about fairness on the one side in terms of flipping the question one way to them, but isn't that highly unfair to the shareholder here? Well, what I'd say is that, first, the issue of equities is not really something the court has to consider. Once you determine, every court is a court of equity, but I would say once you determine that 549 or 362 applies, it's an automatic issue. But on that score, what I would say is there are various other instances we cited cases where- So if that's the case, then let's assume for the moment that what Barton wished to do was to have revenge with regard to an investment gone bad, and therefore he goes into bankruptcy with the deliberate intent to file for bankruptcy and revoke sub-S and ultimately Q-sub status for this debtor. And under your analysis, that's irrelevant, right? Well, frankly, I think it's relevant to, for example, our 362 client seeking punitive damages, but intent is really not part of the calculus. It colors the issues here clearly, and it does go to this notion that the interests here of this non-debtor were very much interwoven with the debtor issue here. The 362 claim protects what with regard to its stay? It protects- Protects what? Property of the estate. So you have to have property of the estate. We're back to the $64,000 question. Absolutely. Or $2.3 million question. It's absolutely the core issue of this case, and we would say that if you buy these control arguments that are presented by the appellants, it goes against much of the precedent of this court in the Atlantic business, where it was a tenant in sufferance, and the tenant in sufferance outside of bankruptcy who was leasing this property, he had no right to control whether or not the landlord kicked him out. But once he filed for bankruptcy, this court saw, took that snapshot, he possessed that valuable interest, and that landlord outside of bankruptcy would be able to control whether that guy stayed there, was unable to lock it up to prevent that debtor from using that valuable interest during the penancy instead. What do we do with Inmate Marvel, which talks about the net operating losses within a consolidated tax group and says that those are not the property of subsidiary estates or pieces of the consolidated group, that there's nothing being transferred because it's really not an interest that's subject to transfer. If I've read the case correctly in that regard, You seem to rely on the NOL cases. Should we be taking a cue from Judge McKelvey's decision in Inmate Marvel? I apologize, I don't know if that's right. What I would say on Ingray's form is we did cite the NOL cases from various other circuits, and that's Ingray-Russell, that's Ingray-Filer in the Ninth Circuit, Russell in the Eighth Circuit. And we did so because those cases came to the conclusion that even though... They were what? Net operating losses? Net operating losses. Foreman, and we take those cases, and Ingray-Prudential, of course. But who controls net operating losses? Well, ultimately, it would be similar to this. The argument would be that it is the sheriff. But isn't the party who is entitled to the net operating loss control? Well, no. I would say that what those cases determined was that control was not the issue. The issue was was that debtor, did that subsidiary have the interest in those net operating losses? That's what the Marble case, it's a District of Delaware case, says, is that if you've got a consolidated tax group, then those NOLs are going to be distributed within that tax group. It doesn't belong to somebody and get transferred to somebody else within the consolidated group. And if that's a correct way to look at net operating losses in a consolidated tax group, isn't there an analogy to be made to S-Corp and Q-Sub status, that these are all related entities controlled by a single person, and it's a complete fiction to be talking about property and estate. This is tax status for the benefit of a single taxpaying entity. Well, I think that that approving should not be applied here, and that rather the court should look to the ruling in Inouye Prudential in the Second Circuit, which looked at a very similar issue, but we came to a different conclusion, and found that the mere fact that an entity may be proof of its parent for certain tax purposes does not vichy the rights and the interests that it has to the valuable interest that the Internal Revenue Code gives it, and that the simple fact that it is grouped together for certain tax purposes doesn't mean it isn't an entity deserving of this analysis of whether it has valuable interests that fall under property and estate. And in Inouye Prudential, the court came out and said, well, no, no, you can't do anything that will affect that, rather. That is part of the status quo that existed at the start of the case. And I'll cite you very strongly as another case that supports the money analysis issue. As we noted in our briefs, we think that that case is highly distinguishable on the facts, because when the court there looked at the status quo of what existed at the commencement of the case, it found that there was a history there where the court specifically said this asset was not part of the estate when it filed. And as we noted, that's not the case here. Let me help with the remedy that the court imposed here again for another minute. Let's hear what your opponents say. I don't know if there was really an issue of what they wrote, but it's a way to figure out what the tax benefit might have been and to order some kind of relief that way. But to impose the Q-sub status is just flat inequitable, because it's not tied in any way to the benefit that the creditors might have lost. There's no end point on it. It untethers the tax liability from the generation of the income, which is contrary to fundamental principle of tax law. Why shouldn't those arguments prompt us to think that the remedy here is untoward? Because, Your Honor, the causes of action asserted by the debtors in this case, Section 362 violation and Section 549 violation, seeking avoidance and avoidance of this transaction. It's an automatic effect. If the elements are met, it's an automatic effect. The implication of the Q-sub status is an automatic effect. I mean, it wasn't advance bonus to say, oh, it's your automatic effect. They're both automatic effects. So the question I'm trying to put to you, and perhaps inartfully, your assertion seems to be creditors here are going to be left holding the bag, and that's contrary to the notions underpinning the code. Your opponents say, look, if the creditors are really worried about it, there's a way to calculate the money that was involved here, and that's what maybe should have happened at most. But to say Q-sub status is reimposed, that creates an inequitable windfall. That really can't stand. What's wrong with their argument? First of all, the notion that there's a windfall for creditors, I think, is kind of ridiculous. The creditors aren't getting a windfall. They're getting what they rightfully deserve. What I would say is this notion of being a fundamental premise of the Inter-Armory Code, that income stays with the tax, income goes with the taxpayer. We know that there are various other instances and cases where the IRS has opined on it the other way, where an LLC files for bankruptcy or a partnership files for bankruptcy, and the same thing happens. The same thing happens. The partners are left holding the bag because it was a past serenity. And in that case, the courts have said, look, you have benefits and burdens of choosing a tax status before bankruptcy, and the automatic stay kicks in, and perhaps it seems inequitable. But I'll also note, there was a way to try to make this all go away, and that is if the non-debtors here, burden appellants, had notified the court, sought authorization of the court, when they wanted to make this transaction. There could have been a way to remedy this, and they decided not to. I don't know. I think you probably know what the answer was. The court's not going to give that approval. It's interesting. Let's just talk about standing for a moment. One of the cases you rely on is the trans lines, and it's a case that sort of, when you look at it, it concluded that the S-corp status was property. It was property, but that the trust seemed like standing to challenge the debtor's S-corp election. I don't get it. It seems really inconsistent. I think I would agree that issue is confusing in the opinion. I think the only way to look at it is that it was two separate issues. It was looking at what is required under the Internal Revenue Code when you're signing an election, who is permitted to sign it, who ought to sign it, and sort of going through the analysis of whether challenging that election is permissible. And then the court took a completely separate look at this S-corp issue. And so I would submit, although it's confusing, I don't think it's inconsistent, and I don't think that it negates the value, the persuasive value of that case. So if it's confusing but not inconsistent, how is it confusing? Well, because I don't think the court does a fulsome analysis of why it's not inconsistent. So I hear what you're saying, but I think— Well, you help us and tell us how it's not inconsistent. Because— How can you say, on the one hand, there's a standing problem, and on the other hand, say, this is property of the state, especially in light of what we agreed at the outset was our framework of analysis. The standing problem in that case, as I understood it, was whether the trustee could challenge the actual election itself. The issue that we cite the case for is whether the revocation was a violation of the automatic stay and whether that status was property of state. And so I think they're two separate issues. So you think it is logically consistent to say you don't have standing to contest the S-corp shareholder pulling or revoking an S-corp status, but it's okay and fully consistent to say, now the automatic stay has to be restricted. I mean, who's in a position to raise the question of the violation of the automatic stay in the instance that the trans-lions court— in the way the trans-lions court views it? As I understand the decision, the issue— they're two separate issues, and the issue with respect to challenging the election itself was the court went through analysis of who needs to sign the actual papers and decided that the trustee didn't have standing there. But that it's not inconsistent because the second question of whether the revocation was a violation of the automatic stay looked at what is property of the estate. And in that instance, it's a broader analysis and that the debtor, in that case the trustee that represents the debtor's interest, was able to challenge it, and we believe the court appropriately found that it was a violation of the code. And I would say that the trans-lion cases— line of cases, although we think highly relevant here, we think you don't even need— and should be extended to the case of case. But what I would go back to is the court's own precedent and how it was viewed properly in the estate, Nijburger, Inouye Atlantic, Inouye Philadelphia newspapers, Shroomhoff, and you get to the same conclusion we think those cases got to. Okay, this is—actually this case is first impression, right? Yes, yes it is, Judge Engel. And I don't—I mean, even the other courts that have dealt with this have dealt with sub-status. I don't know if anybody's really dealt with acute sub-status, have they? That is correct. This is the first time we know of that this case— that this precise issue has come up. But again, we think that if you look to the language of 541, Siegel versus Rochelle, writing pools, and the Third Circuit precedent that I've already cited, plus all the sister circuits precedent that we've noted on the NOL's issue, we get to the same result that Judge Gross got to. Let me ask you then, back to— circle back to where we were at the beginning. If we decide that this is not property of the estate, is there standing? If it's not property of the estate, is there standing for the debtors to— Seek to have what was done here, to have reinstated the acute sub-status? I think the answer would be no, because the debtor is— the debtor is able to pursue to the code to protect its property of the estate. So, clearly, the court issue is Wesson's property of the estate. Okay, thank you very much. Thank you. Mr. Ditt. Mr. Ditt. Following up on Ms. Cazales' last comment, I think that's right, that the property of the estate issue is dispositive of the claims, because it's a— Yeah, I couldn't think of anything else, but I just want to see if I'm thinking incorrectly. Okay. You know, all the Third Circuit precedents cited, the Tennessee suffrage case, the ERISA case, I mean, in every one of those cases, you can point to some right possessed by the debtor apart from bankruptcy law, that's being protected. Tennessee, in its sufferance, has a property interest that's been recognized for 400-plus years. Your Honor, you asked, and I think we all agree, you have to look to the code to determine what the property interest is, the Internal Revenue Code to determine what the property interest is, and you asked counsel, where in the code does it give the Q-sub a property interest, and her answer was, well, the Q-sub is free from taxes. That's not exactly what it says. I mean, the only thing that the Internal Revenue Code says is that the S-corporation may elect to treat a wholly owned subsidiary as part of a singular entity with it for tax purposes. That's the only thing the Internal Revenue Code does, and so it seems to me that the debtor's argument depends entirely on transforming this into a property right, and it just doesn't share the attributes of a property that we're commonly accustomed to. Could you respond, please, to Ms. Casales' assertion that there's nothing inequitable going on here, this happens with, there are cases where partnerships or LOPs get stuck with tax liabilities. I'm sure I'm not doing justice to the way she, frankly, very skillfully, but you heard her response to my question. What's your response to that? Well, I mean, my first response is that at least in the partnership context, there's not this provision of the code that suggests that the partners have the right to terminate that arrangement and elect the partnership itself as the taxable entity, whereas, you know, in this case, I think someone forming a corporation has the expectation of the code that this is how they can arrange their affairs. And, but my second response is, you know, corporate liability generally sort of, it's understood that the shareholders will enjoy limited liability, whereas in a general partnership context, the partners may not enjoy such limited liability. So I, so when, you know, when the partnership debts are paid off, there's a dollar for dollar benefit to the partners. Here, Barnes' claim as a shareholder is fixed during bankruptcy, and so he has the prospect of essentially unlimited liability for what could have been a very small initial investment as a shareholder. So that's why I see the inequities in this case, and I think it also disrupts the expectations of parties who form corporations and make tax elections under the code. These tax elections have never been held outside the bankruptcy context of the property, and we shouldn't, we shouldn't be doing so under, in this case. So for those reasons, I estimate the decision of corporate liability will be reversed. Thank you very much. Thank you. Mr. Gordon. Subject to questions. Subject to questions. A very short response. Two points. First, we mentioned Prudential. Just to inform you, let's remember that Prudential was a C corporation, and as a C corporation, it had, well, it had a tax agreement. It had 74 million of 75 million of MLs. We're not dealing with that in this case, and as one said, that was a C corporation. In Forman, we were dealing with an S, and it was a flow-through. It was a flow-through to the parent, and he said, it doesn't make sense. There's no transfer here. They stated that Prudential was a C corporation rather than an S corporation, that Russell was an individual rather than a corporation. On the C corporation end, the individual was filed for bankruptcy, and the estate created came to have all the assets, including the number of tax revenues, including MLs, and then it goes on to say, but not in our case, because in Forman, it wasn't a C corporation. It was an individual. It was just a flow-through. The court also asked the question, and I find this fascinating. If it had been terminated the day prior to bankruptcy, what would have happened? And the statement was just, well, you would have said it's a 548, fraudulent transfer, or under state law, 544. And obviously, the answer is, well, that would have been a problem. Well, wait a minute. Let's really think about that. First of all, until the day before bankruptcy, in this case, because of the MLC2 case-up, all the income, all the taxes, flowed up through BDR to Mr. Martin. He paid them. And a C, according to what was stated, paid through, these enemies paid through, and made a hole. No harm in the MLC2. With the revocation, if it had occurred the day before, and I don't assume it was property of the state, but for this purpose, let's assume it was property of the state, I would argue, on behalf of the Spartan, that there was reasonable common value. There was no harm. Because on the petition, it was remote. And the petition is filed. And the C is not throwing money out to Mr. Martin. He is keeping the gross income. It's creating this tax liability, and it's paying it. So my argument would be, right along, I'm going to run around saying, wait a minute, there's a defense here. But if there's not a defense, if it's not reasonable common value, then we go to the question about the inconsistency in transline. And that's the way the court responded to it. At page 666, in its border, quote, the court finds as a matter of law that the debtor's revocation of his subchapter S status on March 15, 1995, constituted a, quote, transfer of interest of the debtor in property for purposes of a plaintiff's avoidance action under 11 U.S.C.A., section 548, and 544. The debtors filed an action in which they claimed that this is a post-petition transfer under 549 for which they had a measured amount of damages. And the court said no standing. And the court said no standing. Go figure. Thank you. Thank you. Thank you to all counsel for the very well-presented arguments. We'll take the matter under advisement, and I would ask counsel, if you would, coordinate with the clerk's office the preparing of a transcript of this oral argument with costs to be split between the EDI folks, Hathaway, and your clients, Ms. Gazzazzo, but we'll leave the government out of this one. Maybe after, if the sequester doesn't go through, perhaps we would put it back together. That's it. Thank you. The court may adjourn until Wednesday, everybody say. And that's the end.